IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

PULSE SYSTEMS, INC.,

          Plaintiff,

v.                                              Case No. 6:15-1392-JTM

SLEEPMED INCORPORATED,

          Defendant.

**MEMORANDUM AND ORDER**

This matter came before the court on May 31, 2016, for a hearing on plaintiff's Motion for Preliminary Injunction (Dkt. 14). The parties agreed to the submit the matter to the court based upon previously filed affidavits and on arguments from counsel. The court orally denied the motion at the conclusion of the hearing. This written memorandum will supplement the court's oral ruling.

**I. Background**.

Pulse Systems, Inc. ("Pulse") sells business software applications for use in the health care industry. SleepMed Inc. is the largest private sleep diagnostics provider and ambulatory electroencephalogram provider in the nation. SleepMed has facilities in 32 states.

In 2001, the parties entered into an Information Systems Agreement ("the 2001 Agreement") under which Pulse sold, and SleepMed purchased, a license to use Pulse's practice management software known as PulsePro. SleepMed uses the PulsePro

software for patient registration, scheduling, billing, and other matters. The 2001 contract granted SleepMed a license to use the software at 18 specified SleepMed facilities, and as limited by "the number of Seats, Active User ID's or Servers" identified in the agreement. The agreement defined a "Seat" to include "a personal computer, workstation, or terminal utilized to access the Software, either directly through or at the server." The agreement indicated that the number of "Active User IDs/Seats/Servers" being licensed included 50 PulsePro workstation licenses. SleepMed paid both a license fee and a monthly software maintenance fee.

The 2001 agreement provided that Pulse could audit the "number of Seats, Active User ID's, and/or Servers in use," and, if the actual number in use exceeded the number of licenses, Pulse could invoice SleepMed for the additional number. SleepMed agreed to calculate "the number of Active-User-IDs/Seats/Servers/Facilities actually in use" and to report the number once annually to Pulse, and to pay for additional use beyond what was licensed. The agreement also provided that Pulse could increase software maintenance fees in proportion to any increased usage.

In 2009, Pulse advised that its records showed that SleepMed was using 54 work stations with Pulse software and it requested that SleepMed purchase four additional licenses. SleepMed did so. The monthly software maintenance fee was increased accordingly.

In 2012, the parties entered into a second Information Systems Agreement ("the 2012 Agreement"). In this agreement Pulse sold, and SleepMed purchased, licenses to use Pulse's EHR [electronic health records] software, which enables medical offices to

2

handle patient records and prescribe medication in an electronic format that complies with federal law. Under this agreement SleepMed purchased nine physician and three mid-level provider (including nurse practitioner and physician assistant) licenses. The agreement obligated SleepMed to pay a "simplicity fee" over 60 months that combined the cost of the licenses with a monthly maintenance fee. It also extended the term and adjusted the price of the monthly maintenance fee for the PulsePro software (i.e., from the 2001 Agreement), and provided that no additional license fee was due for the 54 PulsePro licenses.

Pulse contends in 2014 it discovered that in excess of 700 SleepMed employees were logging in to the PulsePro software. It argues the exact number is unknown because SleepMed has failed to provide sufficient information about its usage. It also points out that SleepMed now has over 200 facilities, and it claims SleepMed is using the PulsePro software in excess of both the 54 workstation licenses and the 18 facilities specified in the 2001 Agreement. In December 2014, Pulse submitted an invoice to SleepMed for $2,576,795.19, which it said was "based upon [Pulse's] best estimate of SleepMed's current use of the Software." About $1 million of the invoice was attributed to additional license fees owed by SleepMed, and about $1.4 million was attributed to additional fees for software support.

**II. Motion for Preliminary Injunction.**

Pulse moves for a preliminary injunction to "enjoin SleepMed's unauthorized use of the Pulse software." Dkt. 14 at 8. Pulse contends there is a substantial likelihood it will prevail on the merits, as its evidence allegedly shows that more than 700

3

SleepMed employees are now using the PulsePro software. It contends SleepMed is using the software in excess of the licenses granted, both in the number of users and by using it at more facilities than were authorized. It also claims it has made repeated requests to conduct an audit, as authorized by the parties' agreements, but "SleepMed has refused Pulse's requests." Dkt. 16 at 7.

Pulse claims it will suffer irreparable injury without the injunction because SleepMed's failure to make full disclosure "prevents Pulse from seeking proper compensation for SleepMed's use of the software and makes it impossible for Pulse to determine its full extent of damages." *Id*. at 10. It argues that SleepMed's unauthorized use of the software "amounts to stealing, and deprives Pulse of its intellectual property," such that a presumption of irreparable injury arises. *Id*. at 11 (*citing Autoskill Inc v. Nat'l. Educ. Support Sys., Inc.*, 994 F.2d 1476 (10th Cir. 1993), *overruled on other grounds by TW Telecom Holdings, Inc. v. Carolina Internet Ltd.*, 661 F.3d 495 (10th Cir. 2011)). Finally, Pulse contends that SleepMed "may not be in a position to provide financial compensation" because it operates on a line of credit. Dkt. 16 at 11.

Pulse additionally argues that the public interest, as in copyright cases, favors protecting its intellectual property from unauthorized use, and that the balance of hardships weighs in its favor, as it "will sustain significant financial loss" if SleepMed continues its unauthorized use of the software, while the hardship to SleepMed from an injunction "is nonexistent." *Id*. at 12-13.

4

### III. Standard for Preliminary Injunction.

A plaintiff seeking a preliminary injunction must establish that: 1) it is likely to succeed on the merits; 2) is it likely to suffer irreparable harm in the absence of preliminary relief; 3) the balance of equities tips in its favor; and 4) an injunction is in the public interest. *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008).

A preliminary injunction is an extraordinary remedy that is never awarded as a matter of right. *Petrella v. Brownback*, 787 F.3d 1242, 1256 (10th Cir. 2015) (*citing Winter*, 555 U.S. at 24)). Because of its extraordinary nature, "the right to relief must be clear and unequivocal." *Id.* Additionally, a preliminary injunction that alters the status quo is disfavored, and requires the movant to show that the above factors "weigh heavily and compellingly in its favor." *Fundamentalist Church of Jesus Christ of Latter-Day Saints v. Horne*, 698 F.3d 1295, 1301 (10th Cir. 2012).

### IV. Discussion.

This dispute developed in December 2014 after Pulse allegedly discovered SleepMed's excessive use of software and submitted an invoice for $2.5 million. The status quo is thus represented by the parties' operating relationship prior to that time. Because the requested injunction would alter that status quo, it is considered a disfavored injunction as to which Pulse must make a strong showing. *See Beltronics USA, Inc. v. Midwest Inventory Distribution, LLC*, 562 F.3d 1067 (10th Cir. 2009) (an injunction disturbs the status quo when it changes the last peaceable uncontested status between the parties before the dispute developed).

The court concludes that Pulse has failed to make a showing sufficient to warrant a preliminary injunction. Specifically, Pulse has failed to show that it will suffer irreparable injury if the injunction is denied, or that the balance of harms weighs in favor of the injunction.

Pulse's claims, if true, show it will suffer economic loss without an injunction. But economic loss, standing alone, does not usually constitute irreparable harm. *See Heideman v. South Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003). And Pulse has failed to show that its harm in this instance is unlikely to be adequately compensated by an award of damages. While there are undoubtedly cases in which "it is impossible to precisely calculate the amount of damage," *see Equifax Svcs., Inc. v. Hitz*, 905 F.3d 1355, 1361 (10th Cir. 1990), and a threat of irreparable harm may arise from that fact, the evidence here shows that Pulse's damages are subject to reasonable calculation. That fact is reinforced by Pulse's own invoice in which it estimated SleepMed's software usage. The court sees no reason why a jury could not similarly make a reasonable estimate of SleepMed's software usage, particularly in light of the data supplied by Pulse indicating the likely number of SleepMed users accessing the software. Nor has Pulse shown any likelihood that SleepMed will be unable to pay a damage award. The fact that SleepMed operates with a line of credit does not amount to such a showing.

Pulse argues that SleepMed is "stealing" its software, and attempts to invoke what it says is a presumption of irreparable harm in cases involving the loss of intellectual property. As SleepMed points out, however, the Tenth Circuit declined to adopt a presumption of irreparable harm in *Autoskill Inc.*, the case on which Pulse relies.

6

*See Autoskill Inc.*, 994 F.2d at 1498. Moreover, the Supreme Court has since cast doubt on whether reliance upon such presumptions is appropriate.  *See eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 393-94 (2006) (traditional equitable principles rather than categorical rules determine right to injunctive relief). At any rate, Pulse has not produced any *evidence* that it will incur the loss of customers or of a unique product, or that it will suffer harm to its reputation, absent an injunction. *See Hunter v. Hirsig*, 614 F. App'x 960, 963 (10th Cir. 2015) ("as a matter of well-settled law, allegations of reputational injury *do not* rise to the level of irreparable harm that could justify injunctive relief"). The parties operated under the status quo for a number of years before this dispute developed, and the court is not persuaded that Pulse will suffer irreparable harm if the status quo is maintained until the dispute can be decided.

In weighing the effect of the requested injunction, the court has considered all of the circumstances, including the potential harm to the parties. While, as noted above, Pulse's injury can be adequately compensated by monetary damages, SleepMed cites some evidence that its business and the treatment of its clients would be substantially disrupted by the requested injunction.  Under the circumstances, Pulse has not shown that the balance of equities weighs in its favor.

The court notes that SleepMed has a contractual obligation to provide information about its software usage. Pulse alleges that SleepMed has been less than forthcoming in meeting that obligation. The parties informed the court that a process in currently underway that may produce such information. The parties are directed to report to the court by June 17, 2016, whether they have agreed upon a person to

measure such usage and/or the degree of such usage. If the parties are unable to agree by that date, the court may appoint an independent expert to determine the amount of Pulse's software usage.

**IT IS THEREFORE ORDERED** this 2nd day of June, 2016, that Pulse's Motion for Preliminary Injunction (Dkt. 14) is DENIED.

                                          ___s/ J. Thomas Marten_____
                                          J. THOMAS MARTEN, JUDGE